Number 22-1300, Window Covering Manufacturers Association Petitioner v. Consumer Product Safety Commission, Ms. Zaharsky for the petitioner, Mr. Myers for the respondent. Good morning, Council. Ms. Zaharsky, please proceed when you're ready. Good morning. My name is Nicole Zaharsky representing WCMA. With the Court's indulgence, I'd just like to take a minute to frame the discussion about what this rule does. There are three types of corded operating systems that are used for window covering. First is the traditional cord lock system, where there's a free-hanging cord and you pull it to make the covering go up and down. The second is the retractable, the retractable lift system, where there's a wand and you pull the wand to make the product go up and down. There is a cord attached to the wand, but it's like up at the top of the window covering. It retracts into the top rail when not in use. And then the third is called the continuous loop system. That's where there's a cord or a beaded chain that's in a loop. It's attached to the wall. It's kept under tension. You use it like a pulley system to make the product go up and down. And none of those are used anymore for stock products as of 2018. Can I just ask a question? Does the rule also cover the device that is used if it's a shade to, or I'm sorry, blinds to open or close the blinds? No. Which is sometimes a twist wand, sometimes two cords. Those are tilt cords or tilt wands. Those aren't covered. That's not covered by the rule. Those aren't covered by the rule. They're not an issue here. They're also inner cords in some of the products. Those aren't covered either. It's only what are called operating cords that make the product basically go up and down or from side to side. Thank you. Okay. So these operating cords were eliminated from stock products in 2018, but the industry needed some time to deal with that for custom products. Because sometimes you need cords in custom products. We're talking about windows that are sometimes bigger than 10 feet tall. And so it's just difficult with a cordless solution to get the product up and down. And so the rule at issue here is regulating custom products. And we think it has pretty significant problems, both in terms of the substance and the effective date. And in terms of the substance, what the statute requires the agency to do is to figure out the degree of risk that remains in light of the measures the industry has taken. And if we go back to those three types of window coverings, we have first the traditional free-hanging cord system. Well, those are not allowed even for custom products as of the 2022 industry standard. So those are off the table. Then you have the second type, which is the retractable, where you pull the wand. There have never been any safety incidents on those. The government doesn't cite any. They've been used for 25 years. No safety incidents. And that's not super surprising because the cord is way at the top of the product there and it retracts when it's not in use. So that leaves us with this third type of system, which is the pulley system with the continuous loop. And there the government and the industry have a disagreement about how those products should be addressed. But what the government had to do here was to look at really this, like, small subset of products at issue and say, there's an unreasonable risk remaining. Here's what the degree of risk is. And here's a cost-benefit analysis. And there's a lot of problems, we think, with the way they handled that. But the two main problems are that they rely on data and incidents that are just decades old. They just don't account for any of these new safety measures. And then there are some parts of products, like the retractable or the commercial segment, where there are no safety incidents whatsoever. The government did not find any. And it didn't even consider cost for the commercial product. And I just want to say one, I'm sure the court will have questions, but just one note about the effective date. Because this is really an independent problem. The commissioners decided to override the staff's recommendation here and put in place a six-month effective date. And that's why we came to this court and sought a say, because it's going to cause just hundreds of millions of dollars of disruption to this industry, which is 97% small businesses. The staff said, based on hundreds of comments, that the staff found credible that the industry can't create new compliant products in the six months. They said it can't be done. We've looked at our own knowledge of supply chain. We think these comments are credible. They got comments from the Small Business Administration. They said it can't be done. And the commissioners overrode that with no independent risk or feasibility analysis. And, you know, really the problem here is that this is a pretty unique statute. It puts unique burdens on the agency in terms of the kind of findings they have to make, including substantial evidence to support that effective date. So the government on the effective date one, I just have a question about the effective date. On the effective date point, the government makes the argument that under the way you're looking at the two provisions that both reference effective date, that you're rendering the good cause one superfluous or negatory. Because it does establish a default that says that as long as you're within 180 days, it's okay to go outside 180 days. The commission has to show good cause. What's your response to that? Actually, we think it's the government's view that would cause one of them to become superfluous. But let me explain why. There are these two independent provisions. They were put in the statute at the same time. They have to be right together. The one that the government relies on says that there's 180-day effective date unless there's good cause. And then there's a separate requirement that says that the agency has to justify, including the effective date, justify that the effective date is reasonably necessary using substantial evidence. And so what that means is, you know, that there is 180-day effective date. But if it's not reasonably default effective date, but if it's not, you know, reasonably necessary based on the substantial evidence in the record, that that effective date isn't allowed under that separate provision of the statute. And so that's the provision in section. But isn't the best way to read those two together, that you don't pick something shorter than 180 days unless you have, you know, some good cause, but that the default is 180 days and you only have to have good cause to go the delay further? Why isn't that? Well, I mean, the staff here found that there was good cause to go beyond the 180 days. That's a different argument as to like, whether they had good cause or there's substantial evidence in the record to support disagreeing with the staff. But you seem to be making a different argument also, which is that they had to make a finding that 180 days was appropriate and they didn't make that finding. Aren't you making that argument? Yes, that is exactly the argument we're making, that there are both of those provisions and that the court's job is to give effect to both of those provisions, right? And so the first provision that the government relies on says 180 day effective date. But that's not an upper limit if it's something other than 180 days is allowed for good cause. And there was a good cause here. But there is this separate requirement that we think the government is really overlooking. And it's really an important requirement. Just to kind of frame this, the most important things that the agency has to do here are all in the findings that are required in Section 2058. There's the provisions F1 and F3, and it says the government has to make these specific findings. They actually have to be part of the rule itself, not just evidence to support the rule, but they have to be in the rule itself. And then the judicial review provision says that all of them have to be supported by substantial evidence. And so one of the findings that has to be made is the rule I'm reading from 2058 F3A. The rule, including its effective date, is reasonably necessary to eliminate or reduce an unreasonable risk of injury associated with such product. And then the judicial review provision says that those particular findings have to be supported by substantial evidence. So is there any situation in which the commission would make the reasonable necessity, whatever the exact words is right there? And as to the effective date, and the effective date, let's say, is a year. So it's beyond 180 days. Then does that necessarily establish good cause? I don't know that there are any cases addressing those provisions. I think it probably would establish good cause because the cause would be that it's necessary to serve or to address the risk that is supposed to be addressed. So I think the point is that the default provision is just the default. And we think the government is giving very short shrift to this separate provision, which is that these very particular findings have to be made to justify the rule. And I just think it's notable that this effective date provision, it's in here as part of the findings that Congress said the rule, including its effective date, has to be reasonably necessary. And when you're talking about pretty significant consumer products that take a while to get the supplies, to design them, to manufacture, it's not surprising that there would be effective dates of longer than six months. Can I ask one question about the implications of the effective date argument? So let's suppose, just for argument's purposes, the government will resist this, but arguendo, if we ruled in your favor on the effective date and vacated the rule because of the effective date, then what happens to your constitutional challenge about the removal of the rule? Well, I mean, first of all, if you think there's a problem with the effective date, we think the entire rule should be vacated because the judicial review provision says that the rule shall not be affirmed unless all of the findings are supported by substantial evidence. So we think the entire rule should be vacated and sent back. And in those circumstances, the court would not need to address any constitutional argument because the rule would be vacated. Can we not vacate? In a lot of situations when we have a circumstance like this, if there's one particular part of the rule that's problematic, we'll try to do what's effectively a severability analysis to figure out whether the remainder of the rule stays intact, given the problems with the one. The effective date provision, you started out by saying it's an independent argument. And so if the effective date part of the rule is problematic, then could we not vacate the rule as to the effective date? Well, as you indicated, the court certainly has decisions that talk about partial vacature and when that might be appropriate. We think that the language of the judicial review provision here suggests perhaps that this is not an area where there should be partial vacature because it uses language that's pretty unique in the U.S. So in light of all of the very specific findings that are required is that the rule, the entire rule should be vacated. I, of course, understand that the court has cases addressing other statutes where there is consideration of partial vacature. But to be fair, we don't think to kind of address another issue, we don't think that partial vacature would make sense for independent reasons, which is the analysis that the court failed to do with respect to the risk and with the cost benefit analysis. And we're not coming to this court and second guessing judgment calls that the agency made. We're talking about data that is either fundamentally skewed or just missing. I mean, missing analysis. And what I mean by skewed is the use of incident data that goes back to 2002 and just doesn't account for the safety improvements that have occurred over decades where this industry has been working so hard to make those safety improvements over decades. Maybe you answered the question, but let me just ask the chief judge's question a little differently. So assume for the sake of argument that we agree that either on the effective date or one of the other arguments that you prevail. And assume that we agree with you that that means that we vacate the entire rule. And so, I'm just wondering, should we, though, address all of your arguments so that when the commission redoes the rule, if we were to do all of that, they'll know, oh, their cost benefit analysis was, you know, we thought that that was either fine or not for all of the other ones. Does it make sense for us to address all of those arguments so that the commission knows what we think of them or you think that once we find one, we just vacate the whole thing and send it back. And it's akin to an advisory opinion or something for us to find on any of the other. I mean, of course, it's up to the court in terms of how it wants to proceed, but the court does have all of the arguments before it in terms of the various problems with the rule, including the constitutional problems. And so, with respect to the problems under the Administrative Procedure Act, and the Special Consumer Product Safety Act, you know, we think that the court should go through and address those. We think that those problems are pretty obvious and actually very similar to many of the problems that caused the Tenth Circuit to invalidate the rule in Zen Magnets. I think Chief Judge Srinivasan's question was looking more towards the constitutional issue if the rule were vacated. That, I think, might be a tougher call for the court. Of course, it's up to the court, but normally the court tries to avoid constitutional questions if it can. Although, of course, if the court saw a problem with the structure of the agency here, you know, it would, the solution would be to make those folks removable at will going forward and then send the rule back or send it and send it back for them to consider it again. So, if we found a problem with the effective date and remanded to address that, that wouldn't reopen all the other issues, such as the cost-benefit analysis. You didn't give us the data for this. That would not be touched, correct? And then you would just appeal again those issues after the effective date is addressed? I mean, I think it's up to the court in terms of partial vacature, in terms of what kind of guidance it would want to give. I mean, we would urge the court to address those issues now because we think those failures are pretty glaring. And I should say, you know, the industry here has been wanting to work and has been working in partnership with the agency for decades. And so getting the agency to look not only at the effective date, but at some of the other real failures with the rule we think would be, is very important. And let me just give one example, which is the incident data on which the agency relies. You know, this is something where there was a real failure of the administrative process and where, you know, the industry wanted it to be more of a notice and comment and a collaborative process. Because the agency said, you know, we've got some incident reports dating back to 2009 that we think show an unreasonable risk associated with courted products. And our response to that is, okay, like, tell us what those are, because a lot of the courted products have been eliminated. The ones that everyone was most concerned about with the freeing in courts have now been eliminated for all products as of 2022. And so we want to know of these incidents, are they ones, are they products that complied with the new standards or are they older products? You know, we want to know if there's still risk there. And the agency would not provide the reports at all during rulemaking. It was not until well after rulemaking when we were five days before submitting our brief. And we said, like, look, you told us these are part of the administrative record. And we see these reports and they provided a spreadsheet. It's very small and hard to read. And also doesn't really provide the data to know whether these are newer products or older products and whether the risk. I mean, you started out by saying that some of the incidents that are the predicate for the rule are outdated. But I guess you don't know that, right? I mean, that's the point of not having the underlying incident stuff is that you don't necessarily know, because you don't necessarily know what kind of mechanism was used in the circumstances underlying the incidents that gave rise to the rule. And so it may be a problem that you don't have the incident reports, the underlying information, but you can't necessarily say whether they're outdated or not. Well, we do have some information. So let me tell you what information we do have and what we don't have and what we can tell from the information that we do have. We have that there were 209 incident reports. We they indicated whether they were stock or custom products or unknown. This rule that we're talking about only regulates custom products. So, of course, we wanted to know how many are custom products. They identified only 36 of those that are custom products. And then actually three of them didn't involve operating courts. Well, not 36 of the 209, but because it was 36 of there was 36 that were definitively custom. But that doesn't mean that it's only 36 of the 209 that were custom because there were several for which it was unclear whether it was custom or not. There's some provision that there's some amount that's unknown, actually like 60 percent they said were unknown. And they did indicate what to the extent that they knew what type of courts were involved. And so for some of them, they did indicate on the spreadsheet that they provided well after the rulemaking process that they were the traditional free hanging courts. So we know that those are ones that have been eliminated. And then actually in the in the rule, the agency acknowledged that they think that half of the 33 custom incidents would no longer occur under the new voluntary standards. We don't know exactly how they know that because we don't they have more information about the products than we do. So the point is, we do know something about these 209 incident reports, which tells us that it's really not 209 that involve customs. That it also involves a lot of stock products. That some of them involve the free hanging courts that don't exist anymore. And that the agency itself tells us that of the ones they know are custom, they think at least half would be eliminated by the new voluntary standard measures. And our response to that is great. Then let's focus on what remains. But they're not focusing on what remains. In their cost benefit analysis, for example, when they're figuring out the benefits of the rule, they're using old numbers from 2002. And they're using numbers that don't account for even their own acknowledgement that the voluntary standard would decrease the risk and eliminate about half the product. So I know that this gets awfully technical, but this is an area in which I think Congress wanted that kind of technical analysis to happen because it put these very specific findings in the rule. And I think it comes from a recognition that the agency has power to regulate here, certainly. But it has to really determine the degree of risk that remains in light of the voluntary standards. And then also to determine what the costs are and whether the costs outweigh the benefits. So I have one question, one technical question about the cost benefits. So on the cost part, the argument that you started with in both your opening brief and your reply brief has to do with the baseline against which the cost factor is applied. And your point is that the baseline was off because it's either exclusively or at least largely made up of stock products as opposed to custom products. Did you submit information or do we have a sense of what the delta would be? What's the difference between if you start with the baseline custom or start with the baseline stock? I think that there are comments talking about that comment that custom products are more expensive. How much more? I guess that's the question because if it's not that much more, then the cost benefit analysis already is inevitable in this situation. It's going to be there's going to be a big range and it's going to be based on things that are very, very hard to value a child's life. So I guess the question I'm asking is what leads us to think that it would actually be meaningful? Well, I mean, we're talking about products. I don't I don't have an exact number for you in terms of the delta. And respectfully, we don't think that that's like our burden here because the CPSC is the one who has to do the cost benefit analysis. I also would mention just off the top that there's some costs that aren't accounted for at all, like the whole commercial side of the market, which is like twenty five percent. This cost is not accounted for. But let's let's take that off the table and let me directly answer your question. So there's been an acknowledgement, I think, during this whole voluntary standard process, actually going back to twenty eighteen and twenty nineteen. When the industry said we're going to address stock products first, they're 80 percent of the market. They're smaller. They're simpler. They're easy for us, easier for us to come up with cordless solutions like the ones that have a spring where you can just push it up and down from the bottom. And everyone at that recognized at that point that custom solutions are going to be more difficult because of the bigger products. They're just they're bigger. They're heavier. They have to use different materials as a result. So there is a significant delta there. I don't have an exact number for you on the significant delta. But, you know, even the CPC recognizes the courts have to be used in some custom products because, you know, some of the products are like literally over 10 feet tall. For example, when the staff recommended their effective date, they picked a one year effective date for under 10 feet tall and another one, a two year effective date for over 10 feet tall. It's because these are huge products that cost like thousands of dollars. They're like nothing like what, you know, one of we might buy at Home Depot for our homes. And so, you know, that's that, I think, from the cost perspective, just to kind of summarize from the cost perspective, failure to consider whole categories of costs like the commercial analysis from the and then also the reliance on stock products from the benefits perspective. We think that they've relied on kind of this idea of 20 years ago instance that's not borne out by the more recent data. And I guess I know I'm over my time, but if I can just make one other point with the court's indulgence, you know, we really do think that this is like the Zen Magnets case that was faced in the 10th Circuit where they invalidated a rule about magnets. It actually has some of the same problems in terms of not recognizing and accounting for a trend in the data, relying on incident reports that weren't clearly about the products that issue. And then had the same problem of not accounting for a category of cost where there was the cost that the rule would impose on on the scientific and educational community. I guess just the last thing I would say is, you know, I understand that these are these are important products and we've worked very hard over decades to make them safer and safer. But Congress putting demanding requirements here, and when it has wanted to give them agency more discretion, it's done. So this court had a case about eight months ago called Finbin and involved infant products. And in that case, the court recognized that the CPSC requirements are demanding that there's a demanding cost benefit analysis. And that when Congress wants to give the agency more leeway, it does specifically in different provisions like the ones that applied to infant products. So we just think that, you know, what the agency did here didn't come close to meeting its burdens. So let's suppose we don't find merit in any of those arguments and we feel like we have to reach in your constitutional structural argument. Why isn't this case controlled by Collins v. Yellen in that there's no compensable harm here? And so we we don't even really have to reach the merits of whether the foreclosed provision violates the Constitution. So we think that Collins is pretty distinguishable because the court there limited its decision to retrospective relief and we're seeking prospective relief. There is a rule that is causing harm, billions of dollars, or I'm sorry, hundreds of millions of dollars to the industry if the effective date, you know, goes into effect and if the rule goes into effect in six months. So that is prospective ongoing harm as a result of the rule. Collins addressed a very different and frankly kind of weird situation. Collins was limited to retrospective relief because there were shareholders in Fannie Mae and Freddie Mac who were seeking to invalidate the Third Amendment, this dividend formula that was used in a contract. But actually that had been superseded by another contract. And so there wasn't, you know, an ongoing problem that the shareholders were arguing about. They just wanted to invalidate this dividend formula and get money going money back going backwards. And then the situation was a little more complicated by that than that, because there were two directors of the FHFA involved. There was one, an acting director, who chose to put that Third Amendment in place in the first place, who adopted the contract. And then there was another director that implemented that contract. And so the first acting director was removable at will, so there wasn't a constitutional problem. But then the second director had a constitutional problem that the court identified under SELA law because it had been the one implementing this. And so the Supreme Court, I think, is understandably in kind of a weird position there, that there was kind of like a half constitutional problem and half not constitutional problem and only a claim for backward looking relief and not prospective relief. I'm not sure that the principle in Collins, it's true that involved backward looking relief, but part of the principle there is limited to backward looking relief. And there's other courts of appeals that have applied Collins in the same context as this case, right? Right, so we think that the relevant rule comes actually from the court's decision in Free Enterprise Fund versus PCAOB. That was prospective relief sought, that was a case involving inferior officers, but the court found that there was a problem with removal restrictions. And the court said, we have to provide declaratory relief going forward to make sure that, you know, going forward that the rules are applied in a constitutional manner. And so we think that is the relevant decision. Now, you're right that there are cases, there was a decision from the Fifth Circuit, the Second Circuit, and the Sixth Circuit that have applied Collins to the situation of prospective relief. Respectfully, we think that they're wrong. Now, the Fifth Circuit case has gone to the Supreme Court now on a different issue about the funding of the CFPB. The second one is very recent. We don't know what's going to happen with that. The Sixth Circuit one is actually up on petition for cert at the Supreme Court right now, although it has two issues and the government confessed error on the other issues. So whether the Supreme Court ever reaches the remedy issue is a question mark. I guess the point is, you know, this court isn't bound by any of those other court decisions. It's bound by the decisions of the Supreme Court. And the Supreme Court, I think, has told us two things that are pretty relevant here. The first is under the seal of law decision that there is absolutely a constitutional violation here. The Supreme Court said that the general rule for principal executive officers is that they have to be removable at will. It said that the court has since recognized two exceptions to that that are the outermost limits of the constitutional authority. The government relies on one of them here that involves multi-member expert agencies. But the Supreme Court didn't say the exception was for any multi-member expert agency. It said only those that don't exercise substantial executive authority. So we think that under seal of law, the constitutional violation is clear. Then the question is what the remedy is. And we need to look at what the most relevant Supreme Court decision is on that point. Whatever you think of the reasoning in Collins, the Supreme Court was absolutely clear that it did not involve prospective relief. It only involved the situation of retrospective relief. And the case that the Supreme Court has had that's about prospective relief in this context is the PCAOB case, free enterprise fund. And that one provides a remedy here. How do we know what the court meant by substantial executive authority? How does that map on to this commission? I think the court has given examples in the Collins case that rulemaking authority is substantial executive authority. In Kaiser, I think the Kaiser v. Wilkie, which is from a few years back, the court said that adjudicatory authority is substantial executive authority. In seal of law, the court looked at the ability of the agency there to bring actions, civil actions in court and seek penalties as substantial executive authority. And here the CFPB has all those things and more. It can issue recalls. It can affect over a trillion dollars of the U.S. economy. And I don't think the government is making any argument that they don't have substantial executive authority. So do you think that, in effect, Humphrey's executor has been overruled? No, the Supreme Court has said very carefully, very, very carefully that it's not overruled. And the reason that they said that it is within the exception that the court identified is because there the Supreme Court believed that the 1935 FTC was not exercising substantial executive authority. That's what the court said in its 1935 opinion. It described the authority as quasi-judicial and quasi-legislative. And then the Supreme Court in seal of law, I think, had a very telling, I think it's put in a four, a very telling put in when it said, look, you know, we're taking Humphrey's executor on its own terms, the way that the court described the 1935 FTC's power. We're not going to look behind it to see if there were latent powers that the Supreme Court should have recognized and didn't rely on. We're going to take Humphrey's executor as it stands. And so in that case, which the Supreme Court has characterized in seal of law, is not exercising any significant executive authority. You know, that's just very different from the case here where I think the agency is admitting that there's an exercise of very significant executive authority. I guess I just, if it's all right, I'm going to say one quick point on the remedy question, which is, I think it would be extraordinary to say that there's an ongoing constitutional violation and really, you know, no prospect of a remedy available. The idea that we would need to show some, make some kind of showing to get to actually get a remedy here. I mean, we're talking about a rule that is in place. It's affecting an entire industry. It's, you know, we showed at the state stage that we're talking from the effective date of, you know, millions of dollars, hundreds of millions of dollars hurt to this industry. We also know that it's 97% of small businesses. The Small Business Administration came to the agency here and said, don't do this six-month effective date. You're going to hurt people. And so the idea that there's this here and now injury, as the Supreme Court has called it, that doesn't have a remedy, we think would be really pretty extraordinary. My colleagues don't have additional questions for you. I actually have a question. I'd like to go back for a moment to the incident data. Assuming that that is problematic, that they didn't disclose that to you earlier. I understand that our case law requires you to show that you were prejudiced by that. And I didn't see you arguing that, the prejudice point in your opening brief. I'm kind of wondering if that's forfeited, the prejudice arguments, and also what actually, how actually were you prejudiced? Maybe that's kind of implied by the problems you've had with it. But I haven't heard exactly how you were prejudiced. What would you have done if you would have? I think we would have had an opportunity to provide comment and to address the risks under the rule during the notice and comment process. So I think that because this is part, the risk analysis has to be part of the findings under the rule, under the CPSA, that this is the agency's burden with respect to notice and comment. That it has to provide notice of what's the basis for those findings and give us a chance to comment on it. And so I don't think that there is a prejudice requirement there. But I think the prejudice is actually pretty obvious in terms of that there was absolutely no ability for the public, for the industry to comment on this during the notice and comment process. And this is just not like some small part of the rule. This is like the whole justification for the rule is we see a safety risk here. And what they're relying on is, oh, we're concerned about free-hanging cords. Well, those were eliminated in the 2018 and 2022 voluntary standard. So the industry is very interested to know what else the agency is concerned about because, after all, it's been the industry that's been addressing these things for decades and decades. So the idea that there was just absolutely no opportunity to comment during the rulemaking process and that it resulted in a rule that is requiring the industry to develop completely new products. We haven't really had a chance to talk about this. But what the industry requires for both the retractable systems and the loop systems are products that don't exist now. They are products that you have to come up with from scratch, which is why when the staff did its effective data analysis, it said, okay, the commenter said they need time to get the materials, they need time to do the design, they need time to do the manufacturing, and then they have to get these products to consumers. They tell us that that's going to take two years. We think that that's credible. It's consistent with our own view of the supply chain. It's what the SBA is saying, et cetera. And so I think the prejudice is clear, both in terms of just the complete sandbagging during the administrative process. And I don't say that lately, but I think that's what occurred here. And then the result of that sandbagging, which is now we're subject to a rule that we can't comply with in six months and that we just don't think is even close to justice. At the time of the rulemaking, were the voluntary standards for custom lines in place? So the 2018 standard had made some changes for custom products, including defaulting to cordless products, limiting the length of cords in products, some requirements for tension devices in the loop products. So there were several custom requirements put in place in 2018. Those were in effect. The 2022 voluntary standard was not yet in effect. But the revision to the standard for 2022 started in 2019, and the agency was involved every step of the way. We officially opened a process under ANSI. But under the statute, doesn't the statute say that the agency has to consider voluntary standards that are in place, right? Isn't that the way that the statute is written? Yes, there's a whole bunch of requirements in the statute. We're not relying on that one with respect to the 2022 voluntary standard. We're relying on a different provision that says that the agency has to find that the rule imposes the least burdensome requirement that prevents or adequately reduce the risk. And here the agency actually recognized that the 2022 voluntary standard, which it had been involved in coming up with in partnership with the industry, it recognized that that was a potential less burdensome alternative. It actually considered that as a less burdensome alternative. You can look at that in the final rule in JA-22. So it recognized an obligation to consider it. It wasn't under the provision that Your Honor was citing, but it was under this different provision. It's F-20-2058-3. And, you know, there we just think there was, you know, no real consideration of the risk that remained under the 2022 voluntary standard. And can I come back to the effective date for a moment? Because the commission balanced the risk of severe harm and death to young children over the entire service life of noncompliant window coverings against the possibility that some styles of custom window coverings may be less available during a transition period. That's how they justify the effective date. And your position is that's not justified by substantial evidence. And it seems to me what they're saying is that during this period, before we, I guess, after the effective date, but before the industry is ready, I guess, to change their offerings, there's going to be these noncompliant window coverings being produced. And these noncompliant window coverings are dangerous because they, once you install them, they're there for decades, potentially. And so that presents a risk of harm to children. And they're balancing that against, and during this transition period, you're just saying you're not ready, we're not going to have these available, they're not going to, you know, it's burdensome to you. And they're saying, well, it's more important to us that we protect the children than make sure that we have all these window coverings ready on day one. And so I guess I'd like to understand in more detail why you think that's not supported by the evidence. I mean, that's the problem is that it's, you know, conclusory statements that are supported by the evidence. And let me start with the risk to children, because that is absolutely our number one concern here, something the industry has been working on for decades. So the staff actually did its own analysis and said that any benefit from a six-month rule, as opposed to a two-year rule, that any safety benefit would be very small. That was the staff's analysis after looking through all the comments. I mean, this is the staff that even relied on those 209 incident reports that we think aren't even, like, don't even make sense here. And even in light of that, the staff said that any safety benefit would be very small between six months and two years. And then the staff balanced that. The other side was against the costs of compliance. There were conclusory statements that the commissioners made that they think that the costs of compliance are overblown, but there wasn't evidence to support that. You know, only the staff went through the evidence and found, you know, these hundreds and hundreds of comments that the statements were credible and that it was going to be very disruptive to the industry, that there was going to be a significant impact on small businesses. And, you know, I'd urge the court to take a look at that analysis that's in J428, 495, a couple other places, because the staff looked at evidence and relied on the evidence, and the commissioners didn't. They made some conclusory statements. You know, you identified one of them, but they're just not supported by the evidence. And here, you know, this is a statute that says that the effective date is one of the findings that has to be supported by the evidence. And we just don't think it is here. I mean, the staff said these are credible comments, and the commissioners never came back with any reason to say that they weren't credible. There's no additional questions. Thank you, counsel. We'll give you some time for rebuttal. We'll hear from the government now. Mr. Myers. Good morning, Your Honors. May it please the court. I'm Stephen Myers on behalf of the Consumer Product Safety Commission. I think it's important to understand that the safety standard that's at issue in this case is virtually identical to the stock standard that the industry itself adopted and successfully implemented, again, for stock products in 2008. And the industry adopted that voluntary standard because it is undisputed that operating cords on window coverings have the potential to be extremely hazardous to young children. And so properly framed, the overarching question in this case is whether the commission had a lawful basis for determining that products that pose an equivalent risk of strangling and killing children, custom products, would be subject to the same standard, or whether the commission had to be satisfied with half measures offered up by the industry. Again, it is not disputed that these products can be extremely dangerous. I want to talk about the incident reports and the data on which the commission relied. Because my friend on the other side suggests that the commission was wrongfully relying on data that, you know, related to products that are no longer at issue or that rely on free-hanging cords. What the commission did here was take the universe of incidents of which it was aware and then narrow that down to incidents that would not be addressed by the stock standard. It tried to analyze only the incidents attributable to custom products. And so, yes, it relied, you know, at the outset on a larger universe of incidents, but then it narrowed that down and only focused on the incidents that it thought were going to be governed by this rule. Why not give over the information about the incidents? Because it does, it's pretty striking that the entire predicate for the rule as set up by the rule itself and totally understandably is these incidents because of the palpable horrifying safety risks. So, I completely understand why the commission would have focused on that in detail and did the breakdown that the commission did. But it just seems like typically in these kinds of situations where there's underlying data, underlying analysis, underlying studies, that that's turned over so that it can give rise to the kinds of intelligent comments that then will assist the commission in forming the rule. And that just didn't happen here. Your Honor, what the commission did here was offer a several page long discussion of the incident reports in the notice of proposed rulemaking. And that is in the record at JA61. Yeah. And that was a lot of information for the industry to respond to. I think it's also, it's noteworthy here that even after that. That was some, that is some, that's true. But it's not the underlying materials. And we know that because, I mean, you did produce a spreadsheet later on that had additional information. But isn't it, what's the problem other than the confidentiality point, which we can get to, but some of it is based on newspaper reports and there's nothing confidential about a newspaper report. And so why not give over the information? Your Honor, I can't speak to why that wasn't done during the rulemaking. But again, I think it's important to bear in mind that even after the industry did receive a much more detailed spreadsheet, you know, identifying the facts of which the commission was aware. The type of incident, the year, the age of the child, all of that information. It's not like the other side in their brief is going through line by line and suggesting that these individual facts really affect the commission's analysis. And so if there was an APA error there, we would submit that there wasn't. It was not prejudicial to the industry. The industry was supposed to spreadsheets that never spreadsheet had ever been produced. We'd be exactly the same place, right? These would be the rulemaking, correct? Because that was all done in litigation. That's correct. Maybe they just think that, well, that's we have some information to the spreadsheets and they could think one of two things, maybe both. One of which is that we have some, but not a ton or line items. And secondly, that can't salvage the rulemaking process because even it can't be that it's OK not to turn over everything. And then after the rule is done, turn over everything in litigation and say, well, then there's no harm, no foul with the lack of turning information over because you didn't explain to us now what you would have done with it. I don't mean to suggest otherwise. What was in the rulemaking record is what was in the rulemaking record. We think that what was in the rulemaking record was sufficient because it gave the industry an adequate basis to comment on the rule. It provided the important factual information that they needed. But if the court is concerned about that and doesn't buy what I'm selling on what was provided during the rulemaking, then the fact that the industry did receive more data later in the process, in litigation, and didn't think that it was particularly noteworthy or noteworthy enough to discuss in its briefs to this court, is evidence that there was no prejudice from the purported APA error. An error that, again, we would submit. It's hard to know what the prejudice is in a situation in which the problem is we don't have information with which to make comments because it's hard to display prejudice when the whole problem is a lack of information. And I think, Your Honor, again, the point I'm trying to make on prejudice is that having received more information, having received the spreadsheet following the initiation of litigation, the industry didn't think it was worth discussing in its briefs to this court, which suggests to us that they had received really the bulk of the information that they needed to make an intelligent presentation, both to the commission and to the court. If I may, I'd like to take a step back and try to talk about some of the fundamental flaws in the voluntary standard that was in effect at the time that the commission was actually undertaking rulemaking. And that was the 2018 voluntary standard, not the 2022 voluntary standard. I think the court appreciates this, but just to highlight the point, the 2022 voluntary standard did not exist as a draft piece of paper at the time of the notice of proposed rulemaking. And it didn't exist as an implemented or adopted standard at the time of the final ruling. So to start with the 2018 voluntary standard, that standard has several features that are highly dangerous to children with respect to custom products, which is what we're focused on here. The first, the most meaningful, really, is that it doesn't impose an actual enforceable limitation on the length of the operating courts. There's a default limitation of the court length of 40%. That itself is dangerous, but more importantly, it can be overridden by the consumer. So the consumer or the installer can say, you know, thanks, that's very nice, but I'd actually like to buy a court that's significantly longer. We don't take the industry to really disagree that the 2018 standard was inadequate since they have moved themselves to replace it, but it was hardly unreasonable for the commission to reach the same conclusion. Turning to the 2022 standard, which was again adopted following the approval of the final rule, it too includes numerous dangerous features, features that the industry itself would not permit to be sold on stock products. So starting with continuous courtrooms that depend for their safety on the proper installation of external restraining devices, again, the industry will not sell you that on a stock product. The reason is that they're dangerous. First of all, those restraining devices, even though they're pre-installed, can be removed from the loop. The commission was aware of at least one specific incident in which that happened. That's discussed on JA-23. But even if the consumer doesn't take the step of actually removing the tension device, so long as that tension device is not properly installed on the wall or falls off the wall, it's still possible for the window covering to be operated partially. That is to say, you can raise the window covering halfway up. And again, the commission was aware of an instance in which a child was injured that had a tension device like that that was on the cord, but not properly anchored to the wall. And so that demonstrated to the commission's satisfaction, based on real-world evidence, that this was not a sufficient incentive for the consumer to actually properly install these devices on the wall and ensure the safety of the children who are meant to be protected by these. And that was spelled out in the proposed rulemaking, or that was spelled out in the final? Well, Your Honor, the sites that I'm offering are from the final. And that's because, again, the 2022 standard did not exist at the time of the notice of proposed rulemaking. It did not exist then. So it seems to me that certainly your agency is entitled to make a judgment that what's in the voluntary standards isn't safe enough and you want to go further. The question is just whether the procedures you followed were appropriate to make this rule and whether the effective date you set was reasonable. And it seems to me that this effective date is something that you should address because there are strong arguments that you needed to show that it was reasonably necessary to set this date in order to protect safety. But there's not substantial evidence to support that finding. And it does seem to me that your data about safety wasn't really geared towards this finding because this finding dealt with, should we do six months or a year or a year and a half or two years? We're talking about a short amount of time, but your data was based on over 10 years. All of the window coverings out there, we have yielded about eight deaths per year. And it's not clear to me what was the evidence to show that it was reasonably necessary to set the date that you set. Well, I think as Your Honor alluded to earlier, the Commission was concerned that every unsafe product that is installed in a home would remain there for decades. And so every month that elapses is more unsafe products being installed. But I think it's important to emphasize that Congress placed a heavy thumb on the scale of these voluntary, excuse me, of these standards coming from the Commission taking effect within 180 days. And Congress required that if the Commission goes beyond that 180 days, it needs to make a finding of good cause in the public interest. But what about the other requirement that you have to show that it's reasonably necessary? Your Honor, the Commission did make such a finding of reasonable necessity. That's at 16 CFR section 1260.4 at 6. So the Commission did make that finding. No, I understand. But how was it supported by substantial evidence? Your Honor, again, it's supported by substantial evidence because of the risk of unsafe products being installed, which poses a continuing risk of suffocation and death to children. But I think that the question is, is there a meaningful difference for safety between setting it in six months versus in two years or in one year? Given that there are a lot of countervailing considerations about how disruptive this was and your own staff acknowledged that. Your Honor, the Commission was not persuaded by the industry comments or certain aspects of the staff analysis. But it didn't explain much about that, I have to say. I mean, JA-34 is the relevant reference. And it walked through a handful of points which are stated at a high level of generality, and only some of which you're relying on now, some of which you're not relying on now. But in terms of the benefits, there was indication from the staff that the benefits of having six months rather than two years were pretty minimal, given the amount of old equipment that was already out there. And there's no engagement with that, as far as I can tell, in the Commission's explanation. The Commission's explanation is about costs. Again, Your Honor, I think the Commission's explanation was focused on the fact that Congress had told it to implement these safety standards within 180 days. And so, principally, it was looking for good cause in the public interest, for why it would tell Congress, thanks but no thanks, and not do what Congress said it would do. And it was not persuaded that there was any reason for it to deviate from Congress's instruction. Are you conceding, then, that you were really looking at the good cause provision and not really focused on the reasonably necessary? No, Your Honor. The Commission made both findings. But we do think that it's important, again, under the good cause provision, to honor the statutory presumption that Congress enacted. Just to take a step back here, what the Commission was looking for was not a moonshot. It was not expecting the industry to cure cancer in six months. It was saying that in six months, it needed to start adding a few pieces of plastic and metal to its window covering boards. And the Commission was not persuaded that the industry was not capable of doing that. The Canadian example, I think, is particularly helpful here because the industry told the Canadian governments that there were no viable solutions to replace proven safe products on Canadian shelves. But then what the Commission found was that that was, in fact, not true. That the Canadian market was able to accommodate transition to safer products, just as the American industry was able to accommodate the transition to safer products in the stock market. So we've seen this movie before. How long was there to comply in Canada? It was a little bit longer, Your Honor. But with respect to the stock standard in the United States, that standard, I believe, was initially released in January, I think, of 2018. It was updated in May of 2018. And then there was compliance by the end of 2018. So that was, you know, somewhere in the range of six months to a year, depending on how it's defined. And here we're talking about six months, which is, again, is not that different from what the industry has shown it's been able to do in the past. And particularly here, we're in a universe in which these technologies have begun to be developed because the industry has come up with technologies that comply with the Canadian standard, comply with the stock standard. And so it's not starting from zero. Can I ask you kind of a factual window coverings question? You can try. It seems that your arguments about compliance seem very centered on the rigid cord shroud. And to you, that's like a piece of plastic. They can make that. That's not a big deal. Right. But your friend on the other side says you are trying to analogize to stock window coverings. And there we have things that, you know, you can just lift up with no cord. We can't do that readily on a custom product because it's so much bigger and heavier. It's going to be really hard for us. And it's going to take us some time to be able to develop products that are similar to the stock products. And therefore, your analogy to stock products is not really apt. And I guess my question is, if your position is rigid cord shrouds do the trick and it's easy for them to do that, is it true that they can do rigid cord shrouds for everything while they're developing the other types of things like the self-lifting shades? Yes, sir. I'm looking to see if I have fight in my notes, but the commission did explain that rigid cord shrouds can be used to go to the shroud. And in fact, either either the traditional cord lock type of cord or the continuous loop. So rigid cord shroud can be used for either type of covering and the commission. So that works for everything that converts everything to compliance. A rigid cord shroud I don't think would be used with a retractable cord because that retracts into the headrail. But the commission did explain that a rigid cord shroud can be used with either a continuous loop cord or with a retractable cord. And so how are they supposed to deal with the retractable one in the timeframe that you proposed? Well, your honor, the commission does not require the industry to develop, you know, every mode of complying with the rule. As long as it's able to sell products that comply with the rule. I understand, but it's part of your reasonableness argument that they just have to make some plastic parts here and add it to the cords. And I'm just wondering how easy is it in terms of your reasonableness argument that they can address the retractable cords? Well, your honor, what the commission said was that, you know, there already exists cordless products for all cordless options for all kinds of products, but not for all kinds of sizes. Not for all sizes. My friend on the other side references, you know, very large window covers. For which rigid cord shrouds don't work, right? For which rigid cord shrouds do work. Excuse me, your honor. I thought there was a length after which they don't work. My understanding, your honor, is that they may need to be made of metal rather than plastic in order to satisfy the deformity requirements in the rule. But the shroud can be made longer or shorter. And in terms of how I thought the staff, there's a statement in the record to the effect staff thought it would take two to two and a half years. The staff recommended a longer effect. But with respect to the manufacturing of the rigid cord shrouds in particular. Right. Not on the just a general one to two years, but on how quickly the rigid cord shrouds could be. Your honor, that may well be, but the commission was not persuaded by that analysis. Again, against the backdrop, having seen the industry. I'm into compliance with other similar standards over the past several years. It was not persuaded by that by that. I'm happy to jump through at any issue the court would like to talk about. At this point, or if there are no additional questions. Any additional questions. I guess the. The. It's the jurisprudential question of. Assume for the sake of argument that we find. Merit in one of the arguments made by the issue. Is there grounds for partial vacature? Or based on the statutory language, we vacate the entire. I think it would be more consistent with this course, general practice to partially vacate on the issue where the court identifies a legal flaw, presuming it. The language about the rule not being armed, unless various things are found by substantial evidence. I think from the commission's perspective, though, put aside the constitutional argument for a 2nd, the removal power argument, but. From the commission's perspective, it would be more instructive. To have a sense of how all these arguments shake out so that. If we were in the world where the rule went back to the commission. Then it would have an informed basis for putting together a resolution. You are, I don't know that we've expressed a preference on that 1 way or the other. I think, you know, we would defer the court as to how it writes the opinion except we would like it to deny. Sure. That I would assume would be your favorite position. So, if we found an issue. For example, with your failure to provide the data underlying the incident. Reports and we remanded to allow us to comment. On that, that would not reopen the process from your perspective on things like the cost benefit. So, doesn't that counsel towards us? Addressing all of the issues. Because. Let's suppose we stopped at issue number 1. And we did what you would like us to do only a partial vacature. In the commission adequately resolves. Issue number 1. The petitioners can't come back to us on another mission and. Raise issue number 2, which was raised before because. That wasn't a part of the rulemaking or the order that's under review. So, so they. If there had been merit to issue number 2, it would have been. Essentially overlooked and they would have. No opportunity to raise that issue. In a subsequent issue. I think that point, your honor, I think what we'd like to avoid assuming the court is inclined to remand at all. Is is a situation in which the court remands on 1 issue, and there's a fight about having to redo the entire. We don't know. Right. I mean, you don't want to get a ping pong situation, which just keeps coming back up and going back down on the next issue. It goes back up and it goes back down to the next issue. Correct. Although it's not. We'd also like to avoid a situation where the industry continues to tweak its voluntary standard. And then the commission is expected to redo entire years long rulemaking. Each time it gets, it gets remanded to the court all the more reason for the support to deny the petition for review and get a second. Understood further questions. Thank you counsel. Thank you. Mr. Harsky will give you 3 minutes for rebuttal. Thank you, your honors. I think just a few quick points. 1st, to go back to 1 of judge Sreenivasan's questions. This was about the additional costs of custom products. My co counsel helpfully pointed out to me some pages in the J. the court might look to pages 720 to 721 have very specific comments about how the custom products cost more than stock products. There are also some more general citations about custom products being costing more at 735 and 850. And then I would also note that in the rule itself, 16 CFR 1260.4 D4, the commission acknowledges that that custom products cost more than stock products. So, just wanted to make sure we had that squared away. I'd also like to address the effective date and some of the questions that were asked about the rigid shroud just to be clear about that. The shroud is only a proposed solution for the cord loop. So, under the rule, there are 2 types of operating systems that are allowed. There's the retractable where you pull the 1 and there's the core. The idea for the shroud that the agency has is that it's a plastic piece that has to go over basically the whole loop. And so they estimated a cost for 1 shroud that they think will solve the whole problem. That doesn't address retractable because for retractable, the products have to be remade with a different cord length. And also, we don't think it just makes any sense to say that 1 shroud solves, resolves all of the types of corded product, the cord loops that exist because the shrouds have to be like, different sizes. I mean, some of these windows are 10 feet tall and you're talking about different pieces of plastic that have to be manufactured that haven't been, haven't ever been designed and manufactured before. So I just wanted to correct that. It is the staff that said that the rigid shroud would take 2 years. They call it a little piece of plastic. We call it a requirement that's never been put on the industry before that no one has designed and manufactured. The staff said that that's going to take 2 years. And that only addresses the cord loop solution. It does not address the rules they put on retractable. What percentage are retractable versus cordless? I don't know. I don't think that that exists, that that information is in the record. But, I mean, they are products that are allowed under the rule. I mean, we're talking about some windows that are so big that they need cords so that you can't use the cordless solution. And so retractable remains an option. And then the cord loop remains an option. And another thing I would just note about this retractable system, we've highlighted some of the process failures that we see here in terms of stuff showing up for the 1st time in the final rule, including new incident reports, including the analysis of 2022, et cetera. But 1 of the things that actually showed up for the 1st time in the final rule was the substantive requirement for retractable products. These are products that have had no known incidents. And for the 1st time in the final rule, the agency said now the cord can only be 12 inches long. So we just think that that's, you know, another example of the process failures here. And so I guess the last thing, if I, you know, I see my red light, I promise it will be brief, you know, is, you know, obviously we're all orange right now, but it's about to be red. We're all focused on risk here, and we just don't think that the agency has assessed it in the way that this particular demanding statute requires. Even today, the approach in court has been to talk about possible risks, but the case that we think that is most on point here, the Zen Magnets decision from the 10th Circuit says, no, it's not possible risk that you look at. It has to be a likelihood of risk here that you assess so that you can do this cost benefit analysis. And here you've got the agency admitting that it has found no risk for whole segments of the market, the retractable products, no incidents, commercial products, that's 25% of the market, no incidents. And so, of course, we're concerned about harms to children. That's why we've been working on this since 1996. And we've been the ones updating this voluntary standard. And so we're not saying that the agency doesn't have any ability to regulate here, but it has to go through and do what the statute demands. And it just didn't do it here. And it's not fair to subject this industry to a rule that would go into effect in 6 months and cause hundreds of millions of dollars of damage when they haven't even complied with those basic requirements. So on the cost benefit analysis, that seems to be a very commodious. This has to have a reasonable relationship. The benefits don't even have to outweigh the cost. It just seems to me that there's so much play and give in the standard that it's more difficult to make the argument that that cost benefit analysis, what they did, because they certainly spent time and did analysis and made ranges and said there are some other factors that we could consider. But it seems like they did the work and it's a very loose standard. So why is that cost benefit analysis not okay? Well, I think there's 3 responses and the bottom line, I think, is that we think they didn't do the work. So you're right that it's reasonable relationship, which we think requires some kind of proportionality. We think that the costs were skewed, the benefits were skewed, and then even with those skewed numbers, they ran 30 scenarios and the benefits only exceeded the cost in 1 of them in some of the scenarios. But I'm just trying to say that it wasn't even proportional in 29 of the 30 scenarios. And I guess the problems that we see in terms of your question. What do you mean? It's not proportional? In 29, I mean, I know that the benefits outweigh the cost of them, but I don't think that means it's not proportional. There's a range in terms of how much the costs exceed the benefits. Sometimes it's 135%, sometimes it's 400%, but it's a pretty significant range where I don't think like 400% more cost than benefits would be considered proportional. But I guess maybe the more fundamental point to go to your Honor's question is that we don't think that they did the work here. This isn't like second guessing or nitpicking agencies analysis. It's that fundamental parts of the analysis were either missing or skewed. And what I mean by missing is that you've got like a complete lack of safety incidents for retractable courts. No benefits there that they have identified and yet they're regulating them anyway. You've got no consideration of costs for the commercial segment of the market. That's 25% of the market. That's like a part of the rule. It says that the agency has to figure out the number of products affected. And they didn't even do that because they acknowledge that they didn't even consider that 25%. And so that we think that that's just like a missing analysis. And then when I talked about the skewed analysis, one of the things that I think the discussion identified earlier was to figure out the cost that it was all based on stock products. And there were the questions about how much more expensive custom products are, etc. So assumptions being made that really skewed the cost in terms of basing them on stock products. And then also really skewed the benefits, basing it on data from 2002, that even the agency is now admitting that the number of incidents that occurred decades ago don't occur anymore because of these voluntary standards. And so I take your Honor's point that you don't want to be second guessing the agency here. If it's doing a reasonable job with its cost benefit analysis. But this isn't a normal APA case where Congress just said, figure out what you want to do and give us some evidence that shows that it's reasonable. Congress said, we want you to go through all these steps. We want you to figure out the degree and nature of the injury, the number of products affected, the cost benefit analysis, less burden, some alternatives, go through each of those steps. And when you have a cost benefit analysis that skews the cost, skews the benefits, and then even doing it in 29 of the 30 scenarios, you really don't have proportional costs and benefits, or at least you don't have the benefits outweighing the cost. We just don't think that it meets that burden under the statute. It's just too far away from what Congress wanted to have happen here. Of course, where Congress has wanted to give more discretion to the agency, like, with infant products, like cribs and toddler products, it has passed different statutes to do that. But this statute is one that's more demanding on the agency. Thank you counsel. Thank you to both counsel. We'll take this case under submission.
judges: Srinivasan, Wilkins, Pan